# In the United States Court of Federal Claims

No. 21-1621L

(Filed: May 17, 2022)

**FOR PUBLICATION**

| | |
|---|---|
| **DARBY DEVELOPMENT COMPANY, INC., ET AL.,** | )<br>) |
| *Plaintiffs,* | )<br>)  CDC Eviction |
| v. | )  Moratorium: Fifth<br>)  Amendment Takings &<br>)  Illegal Exaction |
| **UNITED STATES,** | )<br>) |
| *Defendant.* | )<br>)<br>) |

*Creighton R. Magid*, Dorsey & Whitney LLP, Washington, D.C., and *Shawn J. Larsen-Bright*, Dorsey & Whitney LLP, Seattle, Washington, for plaintiffs. With them on the briefs was *John McDermott*, John McDermott, PLLC, Arlington, Virginia.

*Nathanael B. Yale*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Martin F. Hockey, Jr.*, Deputy Director, *L. Misha Preheim*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Mark Pacella* and *Matthew P. Rand*, Trial Attorneys, Natural Resources Section, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, D.C.

## OPINION AND ORDER

**BONILLA, Judge.**

Contemporaneous with the publication of this decision, the United States reached the once unimaginable and grim milestone of one million deaths due to Coronavirus disease 2019 (COVID-19). During the past three years, the executive and legislative branches of our government (federal and state) as well as the American people in cities and towns across this Nation have engaged in critical debates on the best ways to combat the deadly pandemic as well as address the crippling financial fallout impacting the United States and global economies. Passionate policy debates range from vaccines to mask mandates, social distancing to curfews, shuttering businesses to virtual learning, and emergency financial assistance to states and local municipalities, businesses, and individuals.

Throughout this extraordinary time, the judiciary continues to serve the critical role of ensuring that policy decisions, once reached, are in accord with the United States Constitution and federal and state law. Indeed, the true tests of an enduring democracy and an independent judiciary come not in times of peace, tranquility, and good health, but in times of war, unrest, and disease.

At the heart of this case are the decisions of the executive and legislative branches of the federal government to institute and extend nationwide residential eviction moratoria to combat the spread of COVID-19. These measures aimed to prevent homelessness and cohabitation by necessity by allowing people to remain and isolate or quarantine in their homes, particularly those infected or infectious and members of vulnerable populations at increased risk of contracting the deadly virus. Designated as temporary measures, iterations of the residential eviction moratoria remained in effect for seventeen months (from March 27, 2020 to August 26, 2021). Driven largely by a series of extensions issued by the Centers for Disease Control and Prevention (CDC), the nationwide residential eviction moratorium was ultimately voided by the judiciary upon the ground that the CDC lacked the requisite legal authority to take such drastic action.

In this case, more specifically, thirty-eight landlords and rental property owners (of properties ranging from single-family homes to 3,000+ unit apartment complexes located throughout the country) filed suit in this Court asserting that the nationwide residential eviction moratorium effected either a compensable taking or an illegal exaction under the Fifth Amendment. The plaintiffs aver that the government forced them to continue housing non-rent-paying tenants rather than replace them with rent-paying tenants and subjected them to significant fines and imprisonment if they pursued otherwise lawful evictions. Plaintiffs maintain that they alone should not have been forced to shoulder this burden for the benefit of the Nation. Accordingly, this Court is now called upon to assess not as a matter of public policy or equity, but as a matter of law, whether plaintiffs are entitled to any relief under the Constitution.

Before the Court is defendant's motion to dismiss plaintiffs' First Amended Complaint for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted under Rules 12(b)(1) or 12(b)(6), respectively, of the Rules of the United State Court of Federal Claims (RCFC). For the reasons set forth below, the Court **GRANTS** defendant's motion to dismiss for failure to state a claim upon which relief can be granted.

## BACKGROUND

In March 2020, Congress passed, and the President signed into law, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), a $2.2 trillion economic stimulus bill designed to mitigate the devastating financial impacts of the COVID-19 pandemic across the United States and throughout the global economy. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). Among the myriad relief provisions, Section 4024 of the CARES Act imposed a 120-day moratorium (from March 27 through July 24, 2020) on judicial eviction proceedings for residential rental

units receiving federal assistance or financed through federally backed mortgage loans.[1] *Id.* at § 4024(b)(1) (Temporary Moratorium on Eviction Filings). Congress did not renew the statutory eviction moratorium, which expired by its own terms on July 24, 2020.

Two weeks later, on August 8, 2020, the President issued an Executive Order titled Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners. *See* Exec. Order No. 13,945, 85 Fed. Reg. 49,935 (Aug. 14, 2020). Relevant here, Section 3(a) directed the Secretary of Health and Human Services (HHS) and the CDC Director to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or possession." *Id.* at 49,936. In response, on September 4, 2020, the CDC issued an order titled Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 (CDC Order). 85 Fed. Reg. 55,292 (Sept. 4, 2020).

Citing Section 361 of the Public Health Service Act, codified at 42 U.S.C. § 264(a), the CDC declared a nationwide moratorium on all residential evictions within jurisdictions not already covered by similar moratoria adopted by states and local municipalities.[2] 85 Fed. Reg. at 55,292, 55,297. The CDC Order differed from the CARES Act residential eviction moratorium in three material respects. First, the agency's eviction moratorium applied to *all* residential properties nationwide without regard to whether the properties received federal program benefits or were financed through federally backed mortgage loans. *Compare id.* at 55,292 to 55,297 *with* CARES Act § 4024. Second, the CDC Order provided for the imposition of criminal penalties (i.e., fines and imprisonment) for violations of the eviction moratorium.[3] *Compare* 85 Fed. Reg. at 55,296 *with* CARES Act § 4024. Third, unlike the CARES Act eviction moratorium, the CDC Order did not prohibit landlords from assessing "fees, penalties, or interest" for the nonpayment of rent. *Compare* 85 Fed. Reg. at 55,292, 55,294 *with* CARES Act § 4024. Neither the statutory nor the regulatory residential eviction moratorium waived or otherwise excused the nonpayment of rent; instead, they focused on temporarily halting the

---

[1] Unlike the CDC's eviction moratorium, discussed *infra*, the CARES Act eviction moratorium prohibited landlords from assessing "fees, penalties, or other charges to the tenant related to [the] nonpayment of rent." CARES Act § 4024(b)(2).

[2] According to the CDC Order, it "d[id] not apply in any State, local, territorial, or tribal area with a moratorium on residential evictions that provide[d] the same or greater level of public-health protection than the requirements listed in th[e] Order." 85 Fed. Reg. at 55,292, 55,294. American Samoa was also initially excluded due to the fact that the United States territory had no reported COVID-19 cases at that time. *Id.* at 55,292 to 55,294.

[3] The CDC Order provided that violators of the residential eviction moratorium would be subject to fines of up to $100,000 and/or one year in prison unless the violation resulted in a death; in situations involving a related death, the maximum regulatory fine increased to $250,000, and all penalties remained subject to applicable criminal laws. 85 Fed. Reg. at 55,296. The CDC Order also highlighted the potential involvement of the United States Department of Justice. *Id.*

forcible eviction of tenants unable to make timely rent payments due to the pandemic-induced financial crisis.[4]  *See* 85 Fed. Reg. at 55,292, 55,294, 55,296; CARES Act § 4024(b)-(c).

To invoke the protections of the CDC Order, tenants were required to certify under penalty of perjury that they: (1) attempted to secure available government assistance; (2) met specified household income caps[5]; (3) were unable to pay their rent in full due to a significant loss of household income, unemployment or underemployment, or extraordinary out-of-pocket medical expenses; (4) continued paying as much rent as they could reasonably afford; and (5) would be homeless or be forced to cohabitate with others if evicted because they have no other available housing options. 85 Fed. Reg. at 55,293, 55,297.  The CDC Order was initially intended to be in effect from September 4 through December 31, 2020.  *Id.* at 55,292, 55,297.

On December 27, 2020, four days prior to the expiration of the CDC Order, Congress extended the residential eviction moratorium through January 31, 2021, as part of the Consolidated Appropriations Act, 2021.  *See* Pub. L. 116-260, § 502, 134 Stat. 2078-79 (2021). In Section 502, titled "Extension of Eviction Moratorium," Congress stated in full:

> The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Service Act (42 U.S.C. 264), entitled "Temporary Halt in Residential Eviction To Prevent the Further Spread of COVID-19" (85 Fed. Reg. 55292 (September 4, 2020)[)] is extended through January 31, 2021, notwithstanding the effective dates specified in such Order.

*Id.*  In Section 501, Congress contemporaneously appropriated $25 billion in emergency rental assistance for landlords whose tenants defaulted on rent payments during the COVID-19 pandemic.  *Id.* § 501(a)(1) (Emergency Rental Assistance).  Congress did not further extend the CDC Order.  However, on March 10, 2021, in Section 3201 of the American Rescue Plan Act of 2021, Congress appropriated an additional $21.55 billion in emergency rental assistance. Pub. L. 117-2, § 3201, 135 Stat. 4 (2021).

On January 29, 2021, prior to the expiration of the 31-day congressional extension, the CDC issued a supplemental order extending its regulatory residential eviction moratorium through March 31, 2021.  86 Fed. Reg. 8,020 (Feb. 3, 2021).  Thereafter, on March 29, June 24, and August 3, 2021, the CDC further extended its regulatory residential eviction moratorium

---

[4] The CDC Order did not prohibit evictions for reasons other than the non-payment of rent (e.g., criminal activity, safety and security threats, property damage, building code and health ordinance violations). 85 Fed. Reg. at 55,294.

[5] The CDC Order limited coverage to individuals earning less than $99,000 and couples earning less than $198,000, individuals "not required to report any income in 2019 to the U.S. Internal Revenue Service," and individuals who "received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act." 85 Fed. Reg. at 55,293.

through October 3, 2021.[6]  *See* 86 Fed. Reg. 16,731 (Mar. 31, 2021); 86 Fed. Reg. 34,010 (June 28, 2021); 86 Fed. Reg. 43,244 (Aug. 6, 2021).

In the interim, residential landlords, real estate companies, and trade associations filed a series of lawsuits throughout the United States challenging the legality and propriety of the CDC Order.[7]  In the lead case, *Alabama Ass'n of Realtors*, the United States District Court for the District of Columbia held that the CDC Order imposing a nationwide residential eviction moratorium exceeded the federal agency's statutory authority under the Public Health Service Act, 42 U.S.C. § 264(a).  539 F. Supp. 3d at 36-43.  The district court's ruling was then twice appealed to the United States Supreme Court on the issue of whether the trial court's decision to vacate the CDC Order should be stayed pending appeal.[8]  *See Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2320; *Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2485.  In the end, the Supreme Court vacated the stay, noting: "careful review of th[e] record makes clear that the [plaintiffs] are virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority." *Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2486; *accord Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2488 ("The [plaintiffs] not only have a substantial likelihood of success on the merits—it is difficult to imagine them losing.").  Accordingly, the CDC Order was terminated effective August 26, 2021.

## DISCUSSION

Before the Court is defendant's motion to dismiss plaintiffs' First Amended Complaint for lack of subject matter jurisdiction under RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6).  Where, as here, plaintiffs allege that the government's actions were not *ultra vires* in pleading their takings claim, this Court has jurisdiction to examine issues of statutory authorization and construction.

---

[6] There was a three-day gap in the continuous extensions of the CDC Order between the expiration of the June 24, 2021 extension until July 31, 2021, and the August 3, 2021 extension.  *Compare* 86 Fed. Reg. 34,010 (June 28, 2021) *with* 86 Fed. Reg. 43,244 (Aug. 6, 2021).

[7] *See, e.g., Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 29 (D.D.C.), *stay granted*, 539 F. Supp. 3d 211 (D.D.C.), *motion to vacate stay denied*, No. 21-5093, 2021 WL 2221646 (D.C. Cir. June 2, 2021), *motion to vacate stay denied*, __ U.S. __, 141 S. Ct. 2320 (2021); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 1 (D.D.C.) (denying motion to vacate stay), *motion to vacate stay denied*, No. 21-5093, 2021 WL 3721431 (D.C. Cir. Aug. 20, 2021), *stay vacated*, __ U.S. __, 141 S. Ct. 2485 (2021), *appeal dismissed on remand*, No. 21-5093, 2021 WL 4057718 (D.C. Cir. Sept. 3, 2021); *Tiger Lily, LLC v. U.S. Dep't Hous. & Urb. Dev.*, 525 F. Supp. 3d 850 (W.D. Tenn), *stay pending appeal denied*, 992 F.3d 518 (6th Cir.), *aff'd*, 5 F.4th 666 (6th Cir. 2021); *Terkel v. Ctrs. for Disease Control & Prevention*, 521 F. Supp. 3d 662 (E.D. Tex.), *appeal dismissed*, 15 F.4th 683 (5th Cir. 2021); *Brown v. Dep't of Health & Hum. Servs.*, 497 F. Supp. 3d 1270 (N.D. Ga. 2020), *aff'd*, 4 F.4th 1220 (11th Cir.), *vacated*, 20 F.4th 1385 (11th Cir. 2021); *Skyworks, Ltd. v. Ctrs. for Disease Control & Prevention*, 524 F. Supp. 3d 745 (N.D. Ohio), *amended*, 542 F. Supp. 3d 719 (N.D. Ohio), *appeal dismissed*, No. 21-3563, 2021 WL 430587 (6th Cir. Sept. 21, 2021); *Chambless Enters., LLC v. Redfield*, 508 F. Supp. 3d 101 (W.D. La. 2020).

[8] The first appeal to the Supreme Court was largely decided by the fact that the CDC Order was about to expire by its own terms on July 31, 2021.  *See Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2320 (5-4) (Kavanaugh, J., concurring).  The CDC's August 3, 2021 decision to renew the nationwide residential eviction moratorium for a period of 60 days, *see* 86 Fed. Reg. at 43,244, prompted the second appeal to the Supreme Court.

*See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("Appellants' contentions about the lawfulness or authorization of the government's actions, while relevant to whether appellants' takings claims will be successful on their merits, do not affect the jurisdiction of the Court of Federal Claims to consider those claims."); *cf. Straw v. United States*, Nos. 2021-1600 & -1602, 2021 WL 3440773, at *3-4 (Fed. Cir. Aug. 6, 2021) (per curiam) (Court of Federal Claims lacks jurisdiction to consider takings claim where plaintiff fails to concede validity of government's action). Further, this Court possesses jurisdiction to entertain plaintiffs' alternatively pleaded illegal exaction claim. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (Court of Federal Claims has jurisdiction to examine illegal exaction claim based upon plaintiffs' claim that they "'paid money over to the Government, directly *or in effect*, . . . in contravention of [law].'") (emphasis added) (quoting *Eastport S.C. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). Accordingly, the Court appropriately assesses plaintiffs' takings and illegal exaction claims under RCFC 12(b)(6).

A. Standard of Review

Claims that survive jurisdictional challenges remain subject to dismissal under RCFC 12(b)(6) if they do not provide a basis for the court to grant relief as a matter of law. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). "To avoid dismissal for failure to state a claim under RCFC 12(b)(6), 'a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.'" *Kam-Almaz v. United States*, 682 F.3d 1364, 1367 (Fed. Cir. 2012) (quoting *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "At the same time, a court is '"not bound to accept as true a legal conclusion couched as a factual allegation."'" *Kam-Almaz*, 682 F.3d at 1368 (quoting *Twombly*, 550 U.S. at 570 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

B. Takings Clause

The Takings Clause of the Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. In this case, plaintiffs assert that the CDC's nationwide residential eviction moratorium effected a physical taking of their property[9]; more specifically, plaintiffs charge that the CDC Order appropriated their right to remove and exclude non-rent-paying tenants and replace them with rent-paying tenants. Plaintiffs seek to recover from the government, among

---

[9] In their response to the government's motion to dismiss, plaintiffs note that they are not alleging a regulatory taking. *See* ECF 12 at 2 n.1. Accordingly, the Court does not examine the CDC Order under the analytical framework for assessing regulatory takings announced in *Penn Cent. Transp. Co. v. New York*, 438 U.S. 104 (1978).

other forms of relief, the rent tenants failed to pay while continuing to occupy the residences as a consequence of the CDC Order.[10]

As explained by the Federal Circuit:

> A physical taking of land occurs when the government itself occupies the property or *requires* the landowner to submit to physical occupation of its land," *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992), whether by the government or a third party, *see Preseault v. United States*, 100 F.3d 1525, 1551 (Fed. Cir. 1996) (en banc).

*Forest Props., Inc. v. United States*, 177 F.3d 1360, 1364 (Fed. Cir. 1999) (emphasis in original); *see also, e.g.*, *Cedar Point Nursery v. Hassid*, __ U.S. __, 141 S. Ct. 2063 (2021) (government grant of right of access to labor organizations to solicit support for unionization constituted a *per se* physical taking of agricultural employer's property).

To assert a viable takings claim against the United States, the government action in issue must be duly authorized by Congress. *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362-63 (Fed. Cir. 1998) (citing *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920)); *NBH Land Co. v. United States*, 576 F.2d 317, 319-20 (Ct. Cl. 1978) ("a [T]ucker Act suit does not lie for an executive taking not authorized by Congress, expressly or by implication") (citing *Hooe v. United States*, 218 U.S. 322, 335 (1910)), *quoted in Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 803 (Fed. Cir. 1993). Where, as here, a federal agency's actions are not authorized, the actions "may be enjoinable, but they do not constitute [a] taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner." *Del-Rio*, 146 F.3d at 1362 (quoting *Armijo v. United States*, 663 F.2d 90, 95 (Ct. Cl. 1981)) (citing *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed. Cir. 1986)); *Tabb Lakes*, 10 F.3d at 803 (quoting *Armijo*, 663 F.2d at 95).

1. Statutory Authority

Section 361 of the Public Health Service Act empowers the HHS Secretary or their authorized designee "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Relevant here, the ensuing sentence cabins this seemingly broad statutory authority:

> For purposes of carrying out and enforcing such regulations, the [Secretary or their duly authorized designee] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles

---

[10] In addition to rent arrears, plaintiffs seek to recover pre- and post-judgment interest as well as attorneys' fees and costs. *See* ECF 10 at 20.

7

> found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

*Id.*[11]; *see Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2488 ("[T]he second sentence [of § 361(a)] informs the grant of authority by illustrating the kinds of measures that could be necessary: inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of contaminated animals and articles."). The HHS Secretary formally delegated these authorities to the CDC Director. *See* 42 C.F.R. § 70.2.

Addressing the CDC's reliance upon the Public Health Service Act to support the nationwide residential eviction moratorium at issue in this case, the Supreme Court characterized the government's arguments as "breathtaking" and "unprecedented," explaining: "It strains credulity to believe that this statute grants the CDC the sweeping authority that it asserts." *Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2486, 2489; *accord Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2489 ("Section 361(a) is a wafer-thin reed on which to rest such sweeping power."). Vacating the stay of the district court's ruling that the CDC lacked congressional authority to issue the eviction moratorium, the Supreme Court concluded: "If a federally imposed eviction moratorium is to continue, Congress must specifically authorize it." *Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2491.

In response to the Supreme Court's pronouncements in *Alabama Ass'n of Realtors*, plaintiffs argue that the Supreme Court's opinion was limited to the issue of vacatur of the stay pending appeal and, thus, does not constitute a final decision of the Supreme Court on the merits of the statutory authority issue presented here. Whatever the procedural posture of the *Alabama Ass'n of Realtors* appeal, the import of the Supreme Court's opinion is clear and binding on this Court: the CDC lacked the requisite congressional authority to issue the nationwide residential eviction moratorium at the heart of this case. *See Dellew Corp. v. Unites States*, 855 F.3d 1375, 1382 (Fed. Cir. 2017) ("We reaffirm a well-known principle that the Court of Federal Claims failed to follow here: the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit, not the other way around.") (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006)).

Plaintiffs' reliance on the Federal Circuit's decision in *Del-Rio* is similarly unavailing. In *Del-Rio*, officials from the Department of the Interior "required owners of mining leases on federal land to secure special permits before drilling or surveying on the land covered by the leases." 146 F.3d at 1360. Government officials thereafter conditioned the approval of the special permits upon the owners securing easements over the trust lands from the Ute Indian Tribe for whom the United States held the surface estate in trust. *Id.* Distinguishing between an *unauthorized* government act for which a takings claim cannot lie as a matter of law, and an *authorized* government act ultimately *found unlawful* which may constitute a compensable taking, the Federal Circuit explained:

---

[11] The statute also provides the Secretary with limited authority to promulgate regulations to temporarily apprehend, detain, examine, or conditionally release "any individual reasonably believed to be infected with a communicable disease" either entering the United States or engaged in interstate travel. *Id.* § 264(b)-(d).

> In a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, *i.e.*, if their actions are a "natural consequence of Congressionally approved measures," or are pursuant to "the good faith implementation of a Congressional Act[.]" The principle underlying this rule is that when a government official engages in *ultra vires* conduct, the official "will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government 'founded upon the Constitution.'"
>
> In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is "unauthorized" and conduct that is authorized but nonetheless unlawful. Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law.

*Id.* at 1362 (internal citations omitted) (first quoting *NBH Land Co.*, 576 F.2d at 319; then quoting *S. Cal. Fin. Corp. v. United States*, 634 F.2d 521, 525 (Ct. Cl. 1980); and then quoting *Hooe*, 218 U.S. at 322) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 695 (1949)). Further defining *ultra vires* conduct, the Federal Circuit explained that such government actions must be "either explicitly prohibited *or* . . . outside the normal scope of the government officials' duties." *Id.* at 1363 (emphasis added). The *Del-Rio* court ultimately concluded that the officials within the Department of the Interior "were acting within the scope of their statutorily authorized duties," even if their actions were ultimately deemed unlawful. *Id.* at 1362, 1363.

In this case, in contradistinction, although not "explicitly prohibited" by Congress, the CDC Director's issuance and series of extensions of the nationwide residential eviction moratorium was clearly "outside the normal scope of the government official's duties." Indeed, as noted by the Supreme Court in *Alabama Ass'n of Realtors*:

> Originally passed in 1944, this provision has rarely been invoked—and never before to justify an eviction moratorium. Regulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease. *See, e.g.*, 40 Fed. Reg. 22,543 (1975) (banning small turtles known to be carriers of salmonella).

__ U.S. at __, 141 S. Ct. at 2487. As such, consistent with the Federal Circuit's decision in *Del-Rio*, the CDC Order was unauthorized and, thus, *ultra vires*.

      2.    <u>Congressional Ratification</u>

As an initial matter, during oral argument, the Court inquired *sua sponte* whether any of the plaintiffs wished to pursue a takings claim based solely upon Congress' initial 120-day

residential eviction moratorium (from March 27 through July 24, 2020), codified in Section 4024 of the CARES Act, and/or Congress' 31-day extension of the CDC Order (from January 1-31, 2021), codified in Section 502 of the Consolidated Appropriations Act, 2021. *See* Tr. at 52-53 (Apr. 19, 2022) (ECF 22). The Court explained that reliance solely upon congressional action would moot the CDC authority issue. *Id.* at 53. Plaintiffs' counsel declined to pursue an action based solely upon the CARES Act, explaining that none of the plaintiffs' properties were impacted by the legislation because the initial eviction moratorium was limited to rental properties receiving federal program benefits or financed through federally backed mortgage loans. *Id.* at 52. Thereafter, on May 2, 2022, counsel represented to the Court that "plaintiffs will not be pursuing a stand-alone claim based on the Consolidated Appropriations Act of 2021." ECF 25 at 1. Instead, plaintiffs rely upon the acts of Congress in extending the CDC's moratorium in an effort to demonstrate congressional ratification.

Although the Supreme Court did not address congressional ratification in *Alabama Ass'n of Realtors*, both the District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit addressed the issue. *See* 539 F. Supp. 3d at 42-43; 2021 WL 2221646, at *2. The district court and appellate court issued contrary rulings regarding the import of the Consolidated Appropriations Act, and whether Congress' 31-day extension of the CDC Order (from January 1-31, 2021) ratified or confirmed the federal agency's statutory authority under the Public Health Service Act. *Compare* 539 F. Supp. 3d at 42-43 (Congress did not expressly approve the CDC's interpretation of its authority under § 264(a) or provide the agency with additional statutory authority) *with* 2021 WL 2221646, at *2 ("Congress has expressly recognized that the agency had the authority to issue its narrowly crafted moratorium under Section 264"). Suffice it to say, had the Supreme Court agreed with the District of Columbia Circuit's assessment of the CDC's statutory authority, the district court's order would not have been vacated. *See Alabama Ass'n of Realtors*, __ U.S. at __, 141 S. Ct. at 2488 ("The District Court concluded that its stay is no longer justified under the governing four-factor test. We agree.") (internal citation omitted). Nevertheless, the Court will examine the question of ratification under the law of this Circuit.

"Congress may ratify agency conduct 'giv[ing] the force of law to official action unauthorized when taken.'" *Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (quoting *Swayne & Hoyt v. United States*, 300 U.S. 297, 302 (1937)). To establish congressional ratification, a party must first demonstrate that Congress was actually aware of the otherwise unauthorized act. *Id.* (first citing *United States v. Beebe*, 180 U.S. 343, 345 (1901); and then citing *Brooks v. Dewar*, 313 U.S. 354, 360–61 (1941)). Such knowledge is readily established here. In Section 502 of the Consolidated Appropriations Act, Congress specifically extended the CDC's residential eviction moratorium for a period of 31 days, acknowledging that the CDC Order was "issued . . . under section 361 of the Public Health Service Act (42 U.S.C. 264)." *See* Pub. L. 116-260, § 502, 134 Stat. 2078-79 (2021).

The second inquiry is a bit more vexing. Where, as here, the alleged congressional ratification is supposedly codified in an appropriation act, "the appropriation must plainly show a purpose to bestow the precise authority which is claimed." *Schism*, 316 F.3d at 1289 (quoting *Ex parte Endo*, 323 U.S. 283, 303 n.24 (1944)); *accord United States v. Heinszen*, 206 U.S. 370, 390 (1907) (congressional ratification requires an explicit declaration). On the one hand, as

detailed above, in extending the CDC Order for an additional 31 days, Congress concomitantly appropriated $25 billion in emergency rental assistance for landlords whose tenants defaulted on rent payments during the COVID-19 pandemic. *See* Pub. L. 116-260, § 501, 134 Stat. 2078-79 (2021). The following month, Congress appropriated an additional $21.55 billion in emergency rental assistance through the American Rescue Plan Act, Pub. L. 117-2, § 3201, 135 Stat. 4 (2021). These fund allocations plausibly support a finding that Congress sanctioned the specific CDC Order. *See Schism*, 316 F.3d at 1289-90 ("[R]atification ordinarily cannot occur in the appropriations context unless the appropriations bill itself expressly allocates funds for a specific agency or activity."). On the other hand, the nearly $50 billion appropriation may equally demonstrate Congress' effort to obviate the need for the nationwide residential eviction moratorium by allocating funds to avoid or repay rent arrearages. A third possibility, posited in *Skyworks*, is that Congress was simply seeking to maintain the status quo during the January 2021 change in presidential administrations in extending the CDC Order. *See* 524 F. Supp. 3d at 761.

At bottom, Congress' single sentence in the Consolidated Appropriations Act stating that the CDC Order "is extended through January 31, 2021," is insufficient to "explicitly" and "plainly show a purpose to bestow" the requisite statutory authority on the CDC to enact a nationwide residential eviction moratorium under the Public Health Service Act. As necessarily implied in the Supreme Court's opinion in *Alabama Ass'n of Realtors*, and consistent with the law of the Federal Circuit, this Court concludes that Congress did not approve, retroactively or prospectively, the CDC's interpretation of 42 U.S.C. § 264(a); nor did Congress provide the CDC with additional statutory authority to enact a nationwide residential eviction moratorium.[12]

C. Illegal Exaction

Plaintiffs alternatively claim that, if the CDC lacked the requisite statutory authority under the Public Health Service Act, 42 U.S.C. § 264(a), to impose a nationwide residential eviction moratorium, the federal agency's action constituted an illegal exaction. More specifically, plaintiffs assert:

> The CDC Order has enriched the Government at Plaintiffs' expense, directly or in effect, by illegally imposing costs and expenses on Plaintiffs that Plaintiffs should not have to bear and that the Government otherwise would bear, including without limitation the cost of housing delinquent or non-rent paying individuals.

ECF 10 at ¶ 42. The Court finds plaintiffs' illegal exaction claim factually and legally infirm.

As explained by the Federal Circuit in *Aerolineas Argentinas*:

---

[12] Considering the unprecedented nature and scope of the CDC Order, there is no basis upon which to conclude that the federal agency's nationwide residential eviction moratorium fares any better under the congressional acquiescence doctrine. *See Schism*, 316 F.3d at 1294-99 (discussing limited applicability of congressional acquiescence doctrine even where Congress is aware of an agency's *longstanding* statutory interpretation and practice).

> An illegal exaction claim may be maintained when the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation. The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power.

77 F.3d at 1572-73 (cleaned up). Accordingly, to assert a viable illegal exaction claim, plaintiffs must show: (1) money was paid to the government at its direction or was paid to a third party "at the direction of the government to meet a governmental obligation"; and (2) the government's payment directive was contrary to law. *Id.* at 1573.

In this case, plaintiffs concede that they did not make any direct payments to the government. *See* ECF 12 at 37 ("That Plaintiffs did not make payments to the Government is of no consequence; the Government in effect required owners of rental properties to issue credits (or rental deferrals) to tenants for the full amount of rent owed in furtherance of a government 'public health' program."). Indeed, as discussed during oral argument, this case does not involve the imposition of a fine or other criminal penalty under the now-vacated CDC Order. *Compare* 85 Fed. Reg. at 55,296 *with* Tr. at 64-65 (Apr. 19, 2022) (ECF 22). Instead, plaintiffs' illegal exaction claim is based upon an assertion that, by operation of the CDC's nationwide residential eviction moratorium, the government "in effect" directed plaintiffs "to issue credits (or rental deferrals)" to their tenants for rent owed to satisfy an obligation otherwise falling upon the government. ECF 12 at 37.

Contrary to plaintiffs' assertion, the government did not direct plaintiffs to waive or defer rental payments otherwise due them. In fact, unlike the CARES Act, the CDC Order specifically allowed landlords to assess and collect "fees, penalties, or interest" for the nonpayment of rent. *Compare* 85 Fed. Reg. at 55,292, 55,294, 55,296, 55,297 *with* CARES Act § 4024. The CDC Order further permitted landlords to initiate and prosecute judicial eviction proceedings. The sole limitation on landlords was the physical removal of tenants in arears following the issuance of a judicially sanctioned eviction order. *See* 85 Fed. Reg. at 55,293 (defining "Evict" and "Eviction" as any act "to remove or cause the removal of a covered person from a residential property.").[13] To be clear, although this limitation does not equate to the exaction or payment of money directed by the government, it is a significant limitation on—and perhaps the most effective enforcement mechanism within—a landlord's leverage to enforce their lease or rental agreement. Nevertheless, the fact that the entry of a monetary judgment for back rent plus interest, fees, and penalties against a tenant following a judicial eviction proceeding may thereafter prove uncollectable does not convert the landlord's account receivable from a current or former tenant into an account payable to the government ab initio.

---

[13] In response to Frequently Asked Questions (FAQ) regarding "What does CDC mean by 'eviction'?" the federal agency explained: "The [CDC] Order is not intended to terminate or suspend the operations of any state or local court. Nor is it intended to prevent landlords from starting eviction proceedings, provided that the actual physical removal of a covered person for non-payment of rent does NOT take place during the period of the Order." *See* https://web.archive.org/web/20210726203824/https://www.cdc.gov/coronavirus/2019-ncov/downloads/Eviction-Moratoria-Order-FAQs-02012021-508.pdf (last visited May 16, 2022).

Further, although not dispositive, it is notable that contemporaneous with the passage of the initial residential eviction moratorium through the CARES Act, and thereafter through the American Rescue Plan while the CDC Order remained in effect, Congress appropriated nearly $50 billion in emergency rental assistance for landlords and tenants. *See* Pub. L. 116-260, § 501, 134 Stat. 2078-79 (2021); Pub. L. 117-2, § 3201, 135 Stat. 4 (2021). The allocation of such government funds—targeted to address the monetary claims asserted by plaintiffs in this case—undermines the argument that the government was shifting its purported financial burden to the plaintiffs. Moreover, plaintiffs fail to demonstrate that they were forced to incur a *government* obligation or debt. Put simply, the federal government is not generally responsible for providing housing to individuals evicted from their private residences due to their failure to pay rent.

To these points, *Aerolineas Argentinas* is instructive. In *Aerolineas Argentinas*, the government "required . . . airlines to pay to house, sustain, and guard aliens who, having arrived in the United States on plaintiffs' airlines without entry documents, sought political asylum." 77 F.3d at 1568. This practice continued even after Congress enacted the 1986 User Fee Statute, Pub. L. No. 99–591, § 205, 100 Stat. 3341–53 (1986) (codified as amended at Immigration and Nationality Act (INA) § 286, 8 U.S.C. § 1356), shifting the financial burden from the airlines to the federal government. 77 F.3d at 1568-71. In contrast to *Aerolineas Argentinas*, the landlords in this case were not required to bear costs or expenses imposed by statute on the United States. Because the government does not have "'the citizen's money in its pocket,'" no suit lies in this Court under the Tucker Act to recover the money (illegally) exacted. *See id.* at 1573 (quoting *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954)).

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss for failure to state a claim upon which relief can be granted under RCFC 12(b)(6) (ECF 11) is **GRANTED**. The Clerk's Office is directed to **ENTER** judgment accordingly. No costs.

**IT IS SO ORDERED.**

Armando O. Bonilla
Judge